IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SAMUEL J. BROWN,

    Plaintiff,

vs.           No. CIV 07-1119 JB/LFG

MICHAEL J. ASTRUE, Commissioner
of the Social Security Administration,

    Defendant.

### MAGISTRATE JUDGE'S ANALYSIS
### AND RECOMMENDED DISPOSITION[1]

  Plaintiff Samuel J. Brown ("Brown") invokes this Court's jurisdiction under 42 U.S.C. §

405(g), seeking judicial review of a final decision of the Commissioner of Social Security

("Commissioner").  The Commissioner determined that Brown was not eligible for disability

insurance benefits ("DIB") or for Supplemental Security Income ("SSI").  Brown moves this Court

for an order reversing the Commissioner's final decision and remanding for a rehearing.

  Brown was born on November 11, 1955 and was 50 years old at the time of the

administrative hearing on December 16, 2005. [Tr. 70].  He completed the 12th grade. [Tr. 83].  He

previously worked as a lube and oil technician at an oil change business, and as a laborer and driver

at a mine site. [Tr. 79-80, 89-90].  Brown is not married and does not have any children. [Tr. 215,

305-06].  He lives by himself in a trailer which he owns and keeps on a friend's property. [Tr. 306].

---

[1]Within ten (10) days after a party is served with a copy of the legal analysis and
recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such
analysis and recommendations.  A party must file any objections within the ten day period allowed
if that party wants to have appellate review of the analysis and recommendations.  If no objections
are filed, no appellate review will be allowed.

On July 21 and August 5, 2003, Brown filed applications for DIB and SSI benefits, alleging an onset date of November 6, 2002 due to arthritis in his right foot, elbows and hands. [Tr. 17, 73-75, 78, 343-345].   Brown's applications were denied at the initial and reconsideration stages.  [Tr. 39, 43].   Brown requested a hearing and on December 16, 2005, Administrative Law Judge ("ALJ") Mark R. Dawson conducted the administrative hearing, at which Brown was represented by counsel. [Tr. 586-613].   On January 31, 2007, Judge Dawson issued an unfavorable decision, denying Brown's request for benefits. [Tr. 14-24].

On September 19, 2007, the Appeals Council denied Brown's request for review. [Tr. 5-7]. This appeal followed.

### Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2]  The burden rests on the claimant throughout the first four steps of this process to prove disability, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.  If at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are:  at step one, claimant must prove he is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove his impairment is "severe" in that

---

[2]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2007); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[3]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f)(2007); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. §§ 404.1520(b), 416.920(b)(2007).

2

it "significantly limits [his] physical or mental ability to do basic work activities . . . .;"[5] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (2007);[6] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[7]

If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[8] age, education and past work experience, he is capable of performing other work.[9]  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[10]  In cases involving substance abuse, further findings are necessary, as discussed below.

In cases where the claimant is under a disability and there is medical evidence of drug addiction or alcoholism, the Commissioner must make a finding as to whether the substance use disorder is a contributing factor material to the determination of disability – that is, whether the

---

[5]20 C.F.R. §§ 404.1520©, 416.920(c)(2007).

[6]20 C.F.R. §§ 404.1520(d), 416.920(d) (2007).  If a claimant's impairment meets certain criteria, that means his impairments are "severe enough to prevent [him or her] from doing any gainful activity."  20 C.F.R. §§ 404.1525(a), 416.925(a) (2007).

[7]20 C.F.R. §§ 404.1520(e),(f), 416.920(e),(f) (2007).

[8]The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are:  sedentary, light, medium, heavy and very heavy.  20 C.F.R. §§ 404.1567, 416.967 (2008).

[9]20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

3

claimant would still be disabled if he stopped using drugs or alcohol.[11]

In the case at bar, the ALJ made the dispositive determination of non-disability at step five. He found that Brown is under a disability, but his substance use disorder is a contributing factor material to the determination of disability. Specifically, the ALJ found that Brown had severe impairments, including osteoarthritis, gout, alcoholism, and affective disorder. He found that the substance use disorder met the listings. He found further that if Brown stopped his substance use, he would continue to have the severe impairment of osteoarthritis although it was not sufficient to meet the listings. The ALJ found that Brown has the RFC to perform a full range of light work, with certain postural and lifting restrictions, based in part on his finding that Brown's statements concerning the intensity, persistence and limiting effects of his arthritis symptoms are not entirely credible. He found further that, if Brown stopped his substance use he would be unable to perform his past relevant work as a automobile lube technician but that, considering his age, education, work experience and RFC, there are a significant number of jobs in the national economy that he could still perform; the ALJ made this finding by referring to the Grids. The ALJ further found that Brown's substance use disorder is a "contributing factor material to the determination of disability," in that Brown would not be disabled if he stopped the substance use,. [Tr. 17-24].

Brown contends that the final administrative decision is not supported by substantial evidence, that the Commissioner did not carry his burden of proof, and that the Commissioner did not apply the correct legal standards.

## Standard of Review and Allegations of Error

On appeal, the Court's review of the Commissioner's determination is limited. Hamilton

---

[11] 20 C.F.R. § 404.1535, 416.935 (2008).

v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court's function

is to consider whether the Commissioner's final decision is supported by substantial evidence, and

whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116,

1118 (10th Cir. 2004).

To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept

it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a

preponderance.  Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989); Doval v. Barnhart, 331 F.3d

758, 760 (10th Cir. 2003).  Grounds for reversal also exist if the agency fails to apply, or to

demonstrate reliance on, the correct legal standards.  Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th

Cir. 2004).

In Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996), the Tenth Circuit described,

for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the
> evidence, but an ALJ is not required to discuss every piece of
> evidence.  Rather, in addition to discussing the evidence supporting
> his decision, the ALJ must also discuss the uncontroverted evidence
> he chooses not to rely upon, as well as the significantly probative
> evidence he rejects.  (citations omitted).

If supported by substantial evidence, the decision of the Commissioner is conclusive and must be

affirmed.  The Court can neither re-weigh the evidence nor substitute its judgment for that of the

Commissioner.  Langley, *supra*, at 1118.

Brown claims the ALJ erred in the following ways:

(1) the ALJ failed in his duty to develop the record in that he did not elicit appropriate

testimony from claimant, and from the vocational expert ("VE") present at the hearing, and did not

update Brown's medical records from Border Area Mental Health; and

(2) the ALJ's RFC finding for a full range of light work, with a limitation to only occasional posturals, is not supported by substantial evidence due to Brown's severe osteoarthritis.

**Discussion**

The Court finds that the ALJ's determination is supported by substantial evidence, and that the correct legal standards were applied.

Duty to Develop the Record

An ALJ has a duty to fully develop the record, even when a claimant is represented by an attorney. Thompson v. Sullivan, 987 F.2d 1482, 1492 (10th Cir. 1993). The ALJ must ascertain the facts relevant to his decision and must learn the claimant's version of the facts. Dixon v. Heckler, 811 F.2d 506, 510 (10th Cir. 1987). However, this duty does not require the ALJ to act as the claimant's advocate. Henrie v. U.S. Dep't of Health & Human Servs., 13 F.3d 359, 361 (10th Cir. 1993).

As noted above, Brown contends that ALJ failed in his duty to develop the record, in the three ways discussed separately below.

a. *Failure to Assist Counsel in Eliciting Testimony from his Client at the Hearing*

Brown was represented by counsel at the administrative hearing. A review of the hearing transcript indicates that Brown's attorney was unfamiliar with Social Security law and procedures and, as a result, the questioning was not as thorough as would generally be expected when a claimant appears at a hearing with counsel. In spite of his apparent lack of familiarity with Social Security procedures, however, Brown's counsel elicited testimony from his client which explored his family background, work experience and the physical requirements for doing such work, the limitations his physical problems had on doing his past work, the medications he is currently taking, his treatment for mental health problems, classes he is currently taking, and his alcohol and

marijuana use.  (Tr. 590-605).

While Brown's attorney may not have been experienced in Social Security representation, his questioning of Brown at the hearing was professional and elicited sufficient information to provide a basis for the ALJ's factual and credibility determination.  The questioning of Brown by his attorney is distinguishable from that in <u>Thompson v. Sullivan</u>, 987 F.2d 1482 (10th Cir. 1993), a case cited by claimant.  In <u>Thompson</u>, the hearing lasted a total of ten minutes, the ALJ asked no questions, and the questions asked by claimant's counsel were superficial, cursory, and at times counsel even cut off claimant's answers.  In addition, the ALJ in <u>Thompson</u> did not order a consultative examination, in contrast to the present case.

   b. *Failure to Elicit Proper Testimony from the Vocational Expert*

Counsel's questioning of the VE demonstrated that he was unfamiliar with the role of a VE at a Social Security hearing, and he did not provide appropriate hypotheticals for the VE's consideration.  (Tr. 608-612).  Brown argues that, in the absence of strong representation from his attorney, the ALJ had a duty to develop the record by eliciting appropriate testimony from the VE.

Although a VE was called to present testimony at the administrative hearing, the ALJ did not, in the end, rely on any testimony by the VE; rather, he applied the Grids to make his finding of disability.  Thus, any failure to develop the VE's testimony would not have contributed to error on the part of the ALJ unless, as Brown contends, the ALJ was wrong in utilizing the Grids rather than VE testimony.

Brown argues that the ALJ erred in relying on the Grids in making the determination that Brown is capable of performing jobs existing in the national economy, because the record included substantial evidence of nonexertional limitations including postural limitations, and pain, anxiety and depression.  While the ALJ is required to consider whether a claimant's nonexertional

limitations, such as pain or mental health issues, limit his capacity to work by making him unable to perform the full range of work within an RFC category, "[t]he mere presence of some nonexertional pain did not automatically preclude reliance on the grids."  " Ray v. Bowen, 865 F.2d 222, 225 (10th Cir. 1989).  "'[D]isability requires more than mere inability to work without pain' . . . .  The presence of nonexertional impairments precludes reliance on the grids only to the extent that such impairments limit the range of jobs available to the claimant." Ray, at 225-26.

The ALJ did not ignore Brown's testimony regarding pain, nor the medical records showing that he suffered from severe impairments, including osteoarthritis, gout, alcoholism and drug abuse, and an affective disorder. [Tr. 20].  As he is required to do, the ALJ carefully considered whether Brown's substance use was a contributing factor material to the determination of disability.  He found that Brown's gout and affective disorder would no longer be severe if he stopped the substance use.  This finding is supported by substantial evidence to the effect that Brown's recurrent gout is related to his use of alcohol [Tr. 205, 211, 219], and that medication works well to control his symptoms of both gout and depression, when he is not drinking or using marijuana. [Tr. 205, 209-210, 212-213, 216-221, 273, 282, 564].

Thus, the nonexertional impairment of depression is not severe enough to limit Brown's capacity to work, and there was no error in applying the Grids due to the existence of an affective disorder.

As to the nonexertional impairment of pain, the ALJ found that, even if Brown stopped the substance use, he would still have a severe impairment due to his osteoarthritis.  In spite of this impairment, the ALJ found, if Brown stopped the substance use he would have the RFC to perform a full range of light work with only minor postural limitations ("only occasional climbing, balancing, stooping, kneeling, crouching, and crawling" [Tr. 21]).  He based this finding on a review

8

of the record evidence regarding treatment for arthritis and related conditions in both of Brown's knees, his right hand and wrist, and both of his elbows. [Tr. 21-22]. Although there was extensive medical evidence of osteoarthritis, a condition which would normally be expected to produce pain, the ALJ found that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." [Tr. 22]. As discussed below in the section on the ALJ's RFC finding, the record supports the ALJ's findings in this regard.

Thus, the nonexertional impairments of affective disorder and pain are not sufficiently severe to require the use of VE testimony, and the Court finds no error in the ALJ's reliance on the Grids. Thus, any alleged failure to develop VE testimony had no effect on the outcome.

c. *Failure to Obtain Further Medical Records from Border Area Mental Health*

Finally, Brown contends that the ALJ did not satisfy his duty to develop the record in that he failed to obtain medical records from Border Area Mental Health ("BAMH") from the period subsequent to July 2004. The ALJ relied on BAMH records from December 2003 which indicated that Brown continued to abuse alcohol and marijuana and had no intention of alcohol cessation.

The administrative hearing was held on December 15, 2005, and the ALJ's final decision was submitted over a year later, in January 2007. Brown notes that the ALJ considered BAMH records only up to July 2004 and argues that, as part of his duty to develop the record, the ALJ should have requested updated medical records from BAMH prior to issuing his final decision in January 2007.[12]

The Commissioner points out that, in the Notice of Hearing [Tr. 26-31], Brown and his

---

[12]Brown also states that his current counsel has obtained medical records from BAHM up to March 2008 and requests that, should the case be remanded, he be allowed to submit these additional records.

attorney were notified that they could provide additional medical evidence at the hearing, or could ask for assistance in obtaining medical evidence [id., at 28-29], but Brown's attorney did not submit any additional BAMH records.  In addition, the ALJ's January 31, 2007 Notice of Decision [Tr. 14-16], included notice to Brown and his attorney that Brown had the right to file an appeal, and he should submit any additional evidence he wanted the Appeals Council to consider along with his request for review.  [Tr. 14].  On July 9, 2007, the Appeals Council informed Brown's attorney that it was granting his request for an extension of time, and that he should submit any further material he wanted the Council to consider in connection with the appeal. [Tr. 11].

On August 3, 2007, Brown's attorney submitted voluminous additional medical records from various medical providers, dated November 1997 to July 2007 [Tr. 4, 8, 10, 351-585].  This submission did not include any further records from BAMH.  As the Commissioner points out, the Appeals Council considered the additional evidence and did not find anything therein which would provide a basis for overturning the ALJ's decision.  The newer records indicated that Brown continued to drink alcohol daily and use marijuana as late as February and March 2007, and that his depression was well-controlled with medication [Tr. 472, 563-64], and this information was consistent with the ALJ's findings as to substance abuse and the effect of Brown's mental health on his ability to work.

It is claimant's duty to provide medical evidence to support the claim of disability.  20 C.F.R. § 404.1512.  The Commissioner will assist the claimant, if requested, id., but particularly when the claimant is represented by counsel, the ALJ is not obligated to seek out further medical evidence when there is no indication that the record is incomplete, or does not contain sufficient information to allow him to accurately evaluate the alleged disability.  Maes v. Astrue, 522 F.3d 1093, (10th Cir. 2008):

> Although the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record – indeed, to exhort the ALJ that the case is ready for decision – and later fault the ALJ for not performing a more exhaustive investigation.  See Branum [v. Barnhart], 385 F.3d [1268] at 1271-72 [(10th Cir. 2004)] (concluding that the ALJ satisfactorily developed the record when the claimant's "counsel did not indicate or suggest to the ALJ that any medical records were missing from the administrative record, nor did counsel ask for the ALJ's assistance in obtaining any additional medical records").   To do so would contravene the principle that the ALJ is not required to act as the claimant's advocate in order to meet his duty to develop the record . . . . This is particularly the case when the missing medical records are not obvious from the administrative record or otherwise brought to the attention of the ALJ.

The Court rejects Brown's assertions that the case must be remanded due to the ALJ's failure to develop the record.

<u>The RFC Finding</u>

Brown next challenges the ALJ's RFC finding that, absent substance abuse, Brown is capable of performing light work, with some limitations, contending the RFC finding is not supported by substantial evidence.

The exertional requirements for "light work" are set forth in the regulations as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling or arm or leg controls."  20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).  The walking or standing portion of the "light work" definition means: "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.  Sitting may occur intermittently during the remaining time."  SSR 83-10, at *6.

The ALJ found:

11

> If the claimant stopped the substance use, the claimant would have the residual functional capacity to perform a full range of light work activities that required lifting of no more than 20 pounds at a time, frequent lifting or carrying of objects weighing up to 10 pounds, prolonged periods of sitting, standing, and or walking, some pushing and pulling, and only occasional climbing, balancing, stooping, kneeling, crouching, and crawling.

[Tr. 21].

The ALJ then went through the record evidence of impairments in, respectively, Brown's right knee, left knee, right hand and wrist, and both elbows.  He said he considered all symptoms alleged and the extent to which the symptoms are consistent with the objective medical evidence and other evidence, and considered all evidence relating to how Brown would function if he stopped the substance use.  The ALJ concluded that the extent of Brown's physical exertion in connection with his daily activities and hobbies, as well as his interest in doing volunteer work, were inconsistent with his complaints of disabling symptoms.  He also concluded that, if Brown stopped the substance use, his medically determinable impairments could be expected to produce the symptoms complained of, but that Brown's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible.

The ALJ's findings regarding Brown's knees, right wrist and hand, and elbows are summarized below.  The Court determines that these findings, and the conclusion that Brown is still capable of light work with minor postural limitations, absent substance use, are supported by record evidence.

a. _Right knee_

The ALJ pointed to evidence that Brown has experienced pain, swelling, and some limitation of motion in the right knee since 2001.  He noted an MRI of October 9, 2001, significant for a large osteochondral defect involving the medial femoral condyle, a probable tear of the anterior cruciate

12

ligament, injuries to two ligaments, and tendonosis or partial tear of the patellar tendon. The ALJ found that, with help from physical therapy and medication, Brown's right knee showed "remarkable improvement" by November 26, 2001, at which time Brown "was able to perform activities of daily living with much decreased pain, and he could work and kneel without great difficulty." [Tr. 21]. The ALJ further noted that in May of 2003, Brown reported symptoms of numbness down his back, through his buttocks and to his legs; because he stated that these symptoms were resolved with walking, he was advised to walk on a daily basis. The ALJ also noted that an examination of Brown's right knee on August 22, 2003 revealed "a little bit of crepitus and a full range of motion," and in May 2004 the right knee was found to be without erythema or effusion (*i.e.*, escape of fluid into a part or tissue). [Tr. 21].

The finding that Brown's right knee problems do not prevent him from doing light work is supported by the record, as follows:

Brown's alleged onset date is November 6, 2002. Historically, the record indicates that he was hit by a car and broke his leg when he was a teenager, and that one of his knees "went out" while he was playing Frisbee in the late 1970s. [Tr. 154, 433].

On October 3, 2001, Brown was examined by Dr. Chris Hanosh at Grant County Orthopedics for complaints including right knee pain. At that time, Brown reported long-standing pain in his right knee which caused him difficulty climbing up and down stairs – an activity required in his job as an automobile lube technician. X-rays on that date showed a severe lateral patellofemoral tilt, with bone-on-bone changes at the patellofemoral joint, along with evidence of an osteochondral ("OCD") lesion. The doctor wrote in his notes "given the fact that he has such bad disease, I feel that he may benefit from arthroscopic treatment." He ordered an MRI and lab tests to rule out systemic arthritis and to evaluate the size and extent of the OCD lesion. [Tr. 194-195].

13

As the ALJ noted, the MRI taken on October 9, 2001of Brown's right knee showed a large bone bruise at the medial femoral condyle, with an OCD defect. The cartilage was slightly flattened but otherwise appeared intact. The MRI also showed a probable tear of the anterior cruciate ligament ("ACL"), a probable sprain and injury of other ligaments in the right knee, and tendonosis or partial tear of the patellar tendon. [Tr. 198-200].

At a follow-up visit with Dr. Hanosh on October 15, 2001, the doctor noted repeatedly that Brown was a "very poor historian." Although the doctor strongly suspected that the knee condition was caused by trauma, Brown could not initially identify any particular incident, other than the Frisbee injury many years previously; however, Brown eventually acknowledged that he might have sustained a knee injury more recently. The doctor noted:

> This is a difficult problem to interpret. Initially the patient gave no history at all of knee injury of any significance, then today upon further probing he does admit to it. He is essentially a very poor historian and really just can't remember. He has no primary doctors here in town so I do not know what his past medical history is significant for, other then [sic] what he reports, which is nothing. Today, I did explain to him that his MRI is consistent with fairly significant old injury.

[Tr. 193].

Dr. Hanosh further explained to Brown the problems with his patellar tendinitis, his questionable ACL tear, and the OCD lesion. The plan at that time was to refer Brown to physical therapy for rehabilitation of his quadriceps and hamstring muscles, which were atrophied, and various possible treatments for the patellar tendinitis were discussed. Brown was to continue on inflammatory medication for the tendinitis and was to return in six weeks for further discussion of possible treatment for the lesion, and possible reconstructive surgery for the ACL problem. [Tr. 193]. Brown attended physical therapy from September through November 2001, improving until

he felt he was ready to continue with therapy on his own. [Tr. 190-191, 432-452].

On November 26, 2001, Brown returned to the orthopedic clinic for a follow-up visit. Notes from that visit indicate that the right knee was "remarkably better" after the physical therapy sessions. Brown stated at that time that he was able to perform his activities of daily living with much decreased pain and was able to perform his work duties, including kneeling, without great difficulty. Dr. Hanosh noted:

> I did go over his MRI results with him again and to the best of my ability I explained what I believe to be his cluster of problems about this [i.e., the right] knee. I did explain to him that his OCD lesion would likely not heal without treatment, however, he is fairly adamant about wanting to avoid surgery at all costs. I explained to him that this OCD lesion may in fact dislodge and become a loose body, however, the patient states that he is willing to continue with exercise and therapy and come and see me only on an as needed basis. He did express good understanding of all the risks and benefits and this was the decision made.

[Tr. 189]. Brown's next visit with Dr. Hanosh did not occur until May of 2004, at which time he still had some right knee pain, but his primary problem at that time was with his hips, elbows and left knee. [Tr. 188]. An MRI report dated May 26, 2004 appears to show a "resolved" OCD lesion at the medial femoral condyle. [Tr. 548].[13]

In April 2003, Brown saw his primary care physician, Dr. Marianne Luchini, for a gastrointestinal problem. At that time, she noted that he was not very physically active. Brown also told her that he gets pain and cramping in both of his legs when he walks, although if he rests he can start walking again. [Tr. 226]. At a follow-up visit on May 12, 2003, Brown told Dr. Luchini that he gets numbness down his back, through his buttocks to his legs, but that it resolves if he just keeps

---

[13]This document is incomplete in the record, but appears to be part of a report of an MRI of one of Brown's lower extremities.

walking.  She encouraged him to continue walking on a daily basis. [Tr. 225].  However, in September 2004, Brown told a treating physician's assistant that he experiences pain with walking and sitting, and that walking makes it worse. [Tr. 570].

Brown complained of knee pain at an August 22, 2003 visit with Dr. Luchini.  An x-ray of his right knee showed some osteoarthritic changes of the patella and a narrowing of the knee joint spacing, although no osteocytes (*i.e.*, fibrous growths within the bone) and no irregularities of the joint surfaces. [Tr. 220].  The radiologist reported mild degenerative changes of the medial compartment of the right knee, without evidence of acute bone injury or disease. [Tr. 231, 557].  He was given pain medications.  [Tr. 220].

Regarding exercise, at a visit on September 26, 2003 Brown told Dr. Luchini that he was walking occasionally with a friend [Tr. 218]; however, at a visit on December 18, 2003, Brown told her that his body doesn't feel very good, and he doesn't exercise and is not very physically active. [Tr. 215].  Brown had a complete physical on December 18, 2003 for the Income Support Division; at that time, Dr. Luchini noted several health problems, but knee issues were not listed among them. [Tr. 215-217].

Dr. John C. Lund performed a consultative examination of Brown on February 23, 2004. With respect to Brown's right knee, Dr. Lund noted complaints of pain over the past 3-4 years, particularly after about an hour of walking around.  Brown also complained of popping in the right knee daily.  Brown stated that he had to quit working at his lube job in November 2002 due to increasing pain and discomfort in his right knee, among other problems. [Tr. 170].

On examination, Dr. Lund noted that Brown's ambulation was normal, without assistive

devices.[14]  He saw no knee joint swelling, deformity or inflammation and no ligament instability in either knee, although the right patella was tender to compression during flexion.  He noted that Brown could sit, stand, stoop and bend but complained of right knee and foot pain when attempting to squat.  He was capable of straight leg raising to 90 degrees in both legs, and could arise from the exam table without difficulty.  [Tr. 171-172].  Based on Brown's history and physical exam, Dr. Lund concluded that Brown probably does have "some type of internal derangement in the right knee, along with an OCD. [Tr. 172].  He noted further that some of the "apparent laxity" present in November 2002 was no longer present, probably due to the physical therapy of October-November 2001.

He stated further that if Brown did have arthritis, he hadn't had an adequate trial of treatment except for some anti-inflammatory and pain medications.  The doctor noted that Brown would probably not be able to do work involving a lot of standing, until he can get better pain control in his right knee.  He felt that arthroscopic work would alleviate the discomfort in that knee.  [Tr. 172-173].  Dr. Lund concluded that Brown's ability to perform work-related functions was limited, *inter alia*, by his right knee pain which restricted his ability to squat and reduced his ability to stand to 6 hours in an 8-hour day. [Tr. 173].

On September 13, 2004, Brown visited a clinic complaining of increasing leg and thigh pain. He told the physician's assistant ("P.A.") that he suffered from gout and degenerative joint disease, particularly in his knees.  He said that he had pain with walking and sitting, and that walking made it worse.  On examination, his right quadriceps appeared somewhat atrophied.  The P.A. noted that Brown could not afford physical therapy at that time.  He was given pain medications. [Tr. 570]. On

---

[14]In June 2004, Brown stated in a Daily Activities Questionnaire that he sometimes used a cane to help support his knees and to maintain his balance. [Tr. 124].

December 6, 2004, the same P.A. noted some atrophy of the right quadriceps, and although there was pain in the right knee and crepitus (*i.e.*, grating sensation or crackling sound in the joint), Brown still had "fairly good" range of motion ("ROM") in that joint. [Tr. 568]. Similar findings were made at a clinic visit on March 8, 2005. [Tr. 567].

At a clinic visit on December 1, 2005, Brown told the doctor his knees were "pretty much the same" with no new symptoms and that they continued to cause pain. He said that although Ibuprofen helped the pain, it didn't completely relieve it. The doctor assessed Brown with degenerative joint disease and, at Brown's request, took bilateral knee x-rays. [Tr. 565]. An x-ray of one of Brown's knees taken on that date showed mild osteoarthritis.[15] [Tr. 529].

In records dated February 7, 2007 (after the ALJ's decision but before the Appeals Council affirmed it), Brown's treating P.A. noted that he suffered from severe osteoarthritis of the knees, right greater than left, and a recent MRI showed "terrible problems in his knees." [Tr. 524]. A repeat MRI was done, and Brown returned to discuss the results with his health care provider on February 28, 2007. The MRI showed a tear in the right ACL, but there was no swelling or erythema. Brown had good ROM, his ligaments appeared intact. He had some tenderness to palpation in the right knee. He was referred to an orthopedic specialist. [Tr. 521-522].

Brown visited Dr. Roberto Carreon at the Southwest Bone and Joint Institute on March 12, 2007. Brown told the doctor he'd been having problems with both of his knees for years and that sometimes the left was worse, sometimes the right. He denied any catching or locking in the right knee and had not had any episodes of his right knee "going out." The doctor's assessment was that Brown had an ACL tear and OCD lesion in the right knee, that this condition had existed for some

---

[15]The films were not labeled as to whether they represented the left or right knee.

time, and that it had caused some arthritis in that knee.  The doctor determined that an ACL reconstruction was not necessary at that time but could be considered if Brown developed any instability symptoms. [Tr. 578].

The Court finds that the above-noted portions of the record dealing with Brown's right knee problems fully support the ALJ's RFC finding that Brown is capable of a full range of light work, but limited by postural restrictions of only occasional climbing, balancing, stooping, kneeling, crouching, and crawling.

Brown unquestionably has medically determinable impairments in his right knee, including an ACL tear, a lesion that had resolved, and arthritis variously described as "mild" to "severe." However, his leg has never "gone out" on him, and the primary symptoms include tenderness, pain and crepitus.  He consistently had good ROM in the right leg.  Although Brown states he cannot stand or walk for long periods without needing a break, the medical evidence does not clearly or consistently support these statements and they are a matter of credibility, as discussed below.  The Court finds that the record supports the ALJ's determination that Brown is capable of standing and walking for six hours in an eight-hour day with intermittent periods of sitting, or that he can sit most of the time with some pushing of leg controls.

b. *Left knee*

In discussing the left knee, the ALJ first noted a visit by Brown to his treating physician on May 24, 2004 at which he complained of problems with that knee.  The knee was found to be tender, with effusion.  The doctor ordered an MRI, which revealed spur formation and a complex tear or severe degeneration of the medial meniscus.  The ALJ also noted that Brown rejected his doctor's recommendation for surgery, opting instead for conservative treatment consisting of physical therapy and medication.  The ALJ also referred to the February 23, 2004 consultative examination,

19

at which Brown's gait was found to be normal. [Tr. 21].

The finding that Brown's left knee problems do not prevent him from doing light work is supported by the record, as follows:

On February 5, 2004, Brown presented to the emergency room with complaints of discomfort in his left foot and at the back of his left knee.  Brown stated that he may have twisted his foot about five days earlier.  His gait was limited by pain.  X-rays of his left ankle were negative; apparently no x-rays were taken of his knee.  He was diagnosed with cellulitis of the left ankle and prescribed an antibiotic. [Tr. 385-388].

At the consultative examination conducted by Dr. Lund on February 23, 2004, Brown described painful symptoms in his right knee but made no complaints about his left knee.   On examination of the extremities, the doctor noted that Brown had no muscle atrophy, spasms or weakness, and no swelling, deformity, inflammation or ligament instability of either knee.  The right knee was tender to palpation, but there is no note of tenderness, or any other symptom, in the left knee.  Dr. Lund concluded that Brown could sit, stand, stoop and bend.  When attempting to squat, Brown experienced pain in the right knee and foot, but there was no indication of any pain in the left knee.  Brown could do straight-leg raising to 90 degrees bilaterally and could arise from the exam table without difficulty.  [Tr. 170-177].

On May 17, 2004, Brown was seen by Dr. Hanosh at the Southwest Bone and Joint Institute. He complained at that time of bilateral knee pain, left greater than right.  Brown denied any significant trauma to the left knee, other than an injury sustained 20 to 30 years before while playing Frisbee. On examination, he was noted to have marked swelling and tenderness over the left patella and patellar tendon.  X-rays showed some degenerative changes in the left knee, but the joint space was reasonably well preserved.  The doctor assessed Brown with severe patellar tendinitis and

ordered an MRI to rule out any significant intra-articular pathology in the left knee.  [Tr. 188].

The MRI report of the left knee, dated May 26, 2004, showed spurs which had progressed significantly since the prior MRI of October 2001, a possible complex tear of severe degeneration of the medial meniscus posterior horn, a small effusion, and a resolved OCD at the medical femoral condyle. [Tr. 196-197].  Brown returned to see Dr. Hanosh on June 3, 2004 for follow-up after the MRI.  The doctor noted Brown's statement that he had pain directly over the patellar tendon but no medial joint line tenderness.  He diagnosed patellar tendinitis and recommended anti-inflammatory medication and physical therapy. [Tr. 187].

On May 14 and May 21, 2004, Brown reported to his treating psychologist at Border Area Mental Health that, after doing some work in the garden, both of his knees were bothering him.  On May 28, 2004, he told the therapist that his knees felt better; however, on June 8, 2004, he reported arthritis pain in the knees again. [Tr. 274, 276, 278-279].

On June 7, 2004 Brown was seen by M. Heidenfeld, one of his regular P.A.s.  She noted that Dr. Hanosh reported that Brown had a "terrible MRI report" on his left knee, including severe spur formation, and a tear and severe degeneration of the medial meniscus.  Dr. Hanosh thought Brown's knee pain was related to the patellar tendon.  Heidenfeld also noted that, although Dr. Hanosh recommended physical therapy in addition to Brown's anti-inflammatory medication, Brown could not afford physical therapy.  [Tr. 204].  Brown told his psychological therapist on July 13, 2004 that although Dr. Hanosh recommended physical therapy for his knees, he had no insurance, "[s]o I lie on the couch a lot."  [Tr. 268].

On September 13, 2004, Brown saw Heidenfeld again.  His left knee was hot and swollen, with crepitus and decreased ROM secondary to pain.  His quadriceps muscles were atrophied in both legs, right more than left.  The PA noted again that Brown was denied disability and therefore could

not afford physical therapy.  She prescribed Ibuprofen three times a day, in addition to Brown's other pain medications, and told him to return after two weeks of that regimen.  [Tr. 570].

Brown returned to see Heidenfeld again on October 4, 2004, complaining of pain, stiffness and decreased ROM in the left leg.  On examination, he left knee was tender, with crepitus on ROM. He was unable to fully extend the leg.  The joint was swollen, but without warmth or erythema. Heidenfeld diagnosed him with severe degenerative joint disease in the left knee and continued his prescription medications.  She gave him the option of going to Albuquerque for further evaluation and treatment, as he could get free care there; he said he preferred to wait a little longer before doing that. [Tr. 569].

Brown was seen again by Heidenfeld on March 8, 2005.  She noted that he still suffered from chronic pain due to degenerative joint disease and severe osteoarthritis of the left knee.  She refilled his prescription for pain medication and wrote a new prescription for an anti-inflammatory to help with the arthritis pain. [Tr. 567].  Brown returned to see Heidenfeld again on September 15, 2005. He told her the anti-inflammatory did not seem to help.  Brown said that on a regular day, his chronic knee pain was 6 out of 10 although he denied any locking or "giving out" of the knee.  On examination, the left knee had quite a bit of crepitus over the patella, although there was full ROM, no laxity and no effusion.  The P.A. noted that "unfortunately, we have not been able to do much aggressive therapy due to lack of funds."  She prescribed Ibuprofen. [Tr. 566].

Brown told the doctor at a clinic visit on December 1, 2005 that his knees were "pretty much the same" with no new symptoms.  His knees continued to cause pain and, although Ibuprofen helped with the pain, it didn't completely relieve it.  The doctor assessed Brown with degenerative joint disease and took bilateral x-rays of the knees, at Brown's request.  [Tr. 565].  An x-ray of one of Brown's knees taken on that date (the films were not labeled as to whether they represent the left

22

or right knee) showed mild osteoarthritis. [Tr. 529].

On February 2, 2007, Brown returned to see P.A. Heidenfeld with complaints of pain in both knees. He said the pain in his knees and hips made it difficult to walk. On examination, the P.A. noted crepitus in both knees and pain with ROM testing. She diagnosed osteoarthritis in the knees and ordered a repeat MRI of the knees. The MRI, taken February 23, 2007, showed degenerative changes of the left knee due to severe osteoarthritis, a possible sprain of the medial collateral ligament, and tears of the medial meniscus. [Tr. 361]. At a follow-up visit on February 28, 2007, the P.A. noted no swelling, edema or erythema in the knees. Brown had good ROM, and the ligaments of both knees appeared intact. Brown's pain medication was renewed, and he was referred to an orthopedic specialist. [Tr. 521-522].

On March 12, 2007, Brown was seen by Dr. Roberto Carreon, an orthopedic specialist at the Southwest Bone and Joint Institute. Brown said he felt pain in the entire left knee. There was no locking or catching, although the knee did "grind and pop." The doctor noted that the torn medial meniscus, shown on the MRI, did not seem to be giving Brown any symptoms at that time. He recommended arthroscopic surgery to prevent problems in the future. Brown stated he would seek indigent care funding for this surgery. [Tr. 578].

The arthroscopic surgery was performed on March 29, 2007. On that date, Brown reported a sharp catching pain in the left knee which was keeping him from normal activities and seemed to be getting progressively worse. [Tr. 495-497]. At the surgery, Brown was found to have a complex tear of the posterior horn of the medial meniscus of the left knee. The doctor also noted some severe degenerative changes in the patellofemoral joint. The meniscus was debrided, leaving a stable rim. [Tr. 508-509]. The following day, Brown returned, reporting severe pain and edema from the surgery, but Dr. Carreon determined this was normal pain from the surgery. [Tr. 486-493, 577].

23

The Court finds that the above-noted portions of the record dealing with Brown's left knee problems provide substantial support for the ALJ's RFC finding that Brown is capable of a full range of light work, limited by postural restrictions of only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. Brown unquestionably has medically determinable impairments in his left knee. The arthritis and degenerative joint disease in that knee have generally been described as "severe." Brown also had ligament injuries and a complex tear to the meniscus in the left knee, which was corrected by surgery. However, he generally presents with no joint deformity, inflammation or instability, and ROM is normal, albeit sometimes with complaints of pain.

Although Brown states he cannot stand or walk for long periods without needing a break, the medical evidence does not clearly or consistently support these statements and they are a matter of credibility, as discussed below. The Court finds that the record supports the ALJ's determination that Brown is capable of standing and walking for six hours in an eight-hour day with intermittent periods of sitting, or that he can sit most of the time with some pushing of leg controls.

c. *Right hand and wrist*

The ALJ found that Brown has a history of right hand and wrist problems that extend as far back as October 2, 2002. He noted that X-rays have shown an old injury and degenerative changes in these parts, and that examinations have variously shown tenderness, swelling, erythema and limitation of motion. The ALJ also noted that Brown was told in October 2002 that he should avoid repetitive use of his right hand and wrist, but that examinations from August 2003 to January 2004 have been unremarkable. The ALJ also pointed to Dr. Lund's consultative examination of February 23, 2004 at which Brown complained of some hand discomfort but was nevertheless able to pinch, grasp, make a fist, and write.

The finding that Brown's right hand and wrist problems do not prevent him from doing light

work is supported by the record, as follows:

Brown was seen in October 2002 at Occupational Health Resources with complaints of a sore right wrist.  He said he was not sure what happened, but the wrist hurt when he moved it and when he tried to lift anything.  X-rays taken on October 2, 2002 showed a probable old injury with degenerative changes causing flare-ups and increased pain, especially with repetitive work.  Brown was given Ibuprofen and advised that he could return to work but should avoid repetitive work with his right wrist.  [Tr. 144-147].

On August 22, 2003, Brown was seen by his primary care physician, Dr. Luchini.  He complained of pain in several areas including the right wrist and arm.  On examination, his right hand and wrist were swollen and red.  The redness progressed up his right arm about midway to the elbow.  His fingers were somewhat swollen, with a bit of decreased flexion due to pain.  Dr. Luchini wrote, "[t]he joint is exquisitely tender"; this appears to refer to the wrist or perhaps the fingers. [Tr. 220].  Dr. Luchini also noted that Brown has a history of gout with a recent flare-up in a different joint.  She noted further that "[h]e is not taking any medications, and had refused last time to take anything other than Indocin." [Id.].

An x-ray taken on August 22, 2003 showed moderate arthritic changes of the interphalangeal joints in the right hand, and mild to moderate degenerative changes at the radiocarpal joint in the right wrist.  [Tr. 231, 557].  Dr. Luchini prescribed pain killers and medication for relief of gout symptoms.  At a follow-up visit on August 28, 2003, Dr. Luchini noted that Brown had been taking Colchicine (an anti-gout medication), and started on Allopurinol (another gout medication).  At this visit, he arm had "improved greatly."  His wrist was entirely without redness or swelling, and he had a good grip.  Dr. Luchini discussed with Brown the fact his alcohol intake may be a big factor in triggering his gout flare-ups.  [Tr. 219].  At a further follow-up visit on September 26, 2003, Dr.

Luchini noted that Brown was continuing with the Allopurinol and had not had any further gout flare-ups nor any side effects from the medication. His wrists were not red, swollen or tender at that time. [Tr. 218].

As noted above, on December 18, 2003, Dr. Luchini performed a complete physical examination. She noted at that time that Brown "continues to drink, continues to have problems with gout." [Tr. 216]. Brown told her that his wrist hurts every morning when he wakes up; however, if he takes some Indocin (a medication for inflammation and pain), the pain goes away. Dr. Luchini noted that "things have gotten better" with the gout in his wrist and ankle since he'd been on Allopurinol. Brown told her that his body generally doesn't feel very good, but he doesn't exercise and is not very physically active. He also acknowledged that he was continuing to drink, approximately 2-6 six-packs per week. Dr. Luchini noted that Brown's alcohol use exacerbated the gout. [Tr. 217].

At his next visit with Dr. Luchini on January 1, 2004, Brown's wrists and hands showed no redness or swelling. [Tr. 212]. At a visit on February 9, 2004, Dr. Luchini noted that Brown had decreased his drinking to about two or three drinks per week, which she felt was significant in reducing his gout flares. [Tr. 211]. At an April 4, 2004 visit, Dr. Luchini wrote that Brown was taking Percocet every day for chronic wrist pain and osteoarthritis. [Tr. 209]. At a May 24, 2004, she noted that Brown had a decreased grip secondary to pain, in both hands. She assessed him with degenerative joint disease in a number of joints, including the wrist and hands. His gout was well controlled on Allupurinol at that time. [Tr. 205].

At the consultative examination done by Dr. Lund on February 23, 2004, Brown stated that he had daily discomfort in both hands, and that work caused them to become stiff. Brown also reported pain and restricted movement in his right wrist. He told Dr. Lund that he had to stop

26

working at the lube facility because of pain in his knee and foot with prolonged standing, but also because of mild swelling and stiffness in both hands from his work. [Tr. 170]. Dr. Lund's physical examination showed no joint swelling, deformity or inflammation (except at the elbow). He saw no swelling in the hands, but Brown indicated he had discomfort in the first M-P joint in both hands upon attempted ROM of the finger. However, the doctor noted that Brown could pinch, grasp, make a fist, and write. [Tr. 172].

Dr. Lund concluded that Brown probably had osteoarthritis in both wrists and the beginnings of arthritis in both hands. He felt that Brown would not be able to return to a type of work that required a lot of hand use until he got better control of the discomfort in his wrists and hands. He noted that Brown had not yet had an adequate trial of arthritis medications for pain and inflammation, other than Indocin. [Tr. 172-173]. In terms of Brown's ability to do work-related activities, Dr. Lund said that Brown's right wrist pain would limit his lifting and carrying abilities, and his ability to do fine manipulation with his hands and fingers was also limited, due to the pain Brown reported in his right wrist and stiffness in his fingers upon prolonged use. [Tr. 176-177].

The Court finds that the above-noted portions of the record dealing with Brown's right hand and wrist problems support the ALJ's RFC finding that Brown is capable of a full range of light work, but limited by postural restrictions of only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. Brown does have a history of problems in his right hand and arm. However, it is apparent that many of his complaints in those areas are caused by gout, which he can control with medication and abstinence from alcohol. The pain in these areas is generally described in the records as moderate, and it decreases with medication. Although Brown describes problems with shaving and combing his hair due to the hand and wrist problems, he can still drive a car, perform household duties including building a porch onto his trailer. In addition, he enjoys hobbies

such as wood carving and painting, which require extensive use of the hands.

There is nothing in the record outlined above to refute the assumption that Brown can lift up to 20 pounds at a time with frequent lifting of objects weighing up to 10 pounds, or that he can perform a job that requires sitting  most of the time with some pushing of arm controls.

d. *Elbows*

The ALJ noted Brown's problems with both elbows, including complaints of pain, swelling, stiffness and decreased ROM.  He pointed to physical examination findings in April and May 2004 which were consistent with the complaints and noted that x-rays showed calcific tendinitis and osteoarthritis.  The ALJ stated that, while the medical records show that Brown's elbow symptoms have persisted despite several modes of conservative treatment, his most recent medical records do not indicate any continuing complaints of problems related to his elbows. [Tr. 22].

The record, as follows, supports the conclusion that Brown's elbow problems do not prevent him from doing light work:

At the time of the consultative examination on February 23, 2004, Dr. Lund found no joint swelling, deformity or inflammation, except an enlarged bursa over the left elbow.  He found that Brown had no limitations with respect to overhead reaching.  [Tr. 17 1772].

On April 13, 2004, Brown was seen by P.A. Jill Steidl.  He complained of pain and decreased ROM in the right elbow for about four days.  The pain started when he did a lot of yard work with a saw and other tools, employing repetitive motion in the right arm.  He said that when he resumed work after resting for awhile, he noticed a significant decrease in ROM in that arm.  On physical examination, the P.A. noted some swelling over the right elbow, with tenderness and some redness and warmth.  She made a differential diagnosis of gouty attack vs. significant tendinitis or possibly cellulitis.  She prescribed anti-gout medications and ordered an x-ray. [Tr. 208].  The x-ray

28

of Brown's right elbow was taken on April 13, 2004.  It showed soft tissue calcification of the elbow joint, suggesting calcific tendinitis, and spur formation consistent with osteoarthritis. [Tr. 228, 549].

Brown returned for a follow-up visit with Steidl on April 16, 2004.  The right elbow had improved – less tenderness and pain, no redness, slightly better ROM – but he still had some symptoms.  Her assessment was calcific tendinitis; her plan was to consult with Grant County Orthopedics regarding potential next steps in treatment. [Tr. 207].  Steidl next reported a telephone conversation with orthopedist Dr. Carreon, who felt that the most appropriate approach would be conservative therapies, including anti-inflammatories, heat and ice, ROM exercises, and physical therapy if possible.  He did not recommend an injection in the joint. [Tr. 206].

At a meeting with his mental health counselor on April 16, 2004, Brown reported pain in his right elbow from tendinitis. [Tr. 283].  At his next meeting on April 30, 2004, he told the counselor that his doctor gave him some exercises that help his arm, and that it was doing better at that time. He also told her he had been exercising more and building a porch onto his travel trailer. [Tr. 282].

On May 17, 2004, Brown was seen by Dr. Hanosh at the Southwest Bone & Joint Institute. He came in for help with hip pain and bilateral elbow pain.  Brown told Dr. Hanosh at that time that he was taking medications for his gout but didn't think they were helping.  On physical exam, the doctor found very limited motion and "bogginess" of both right and left elbows.  He concluded that the symptoms were caused by gout and planned to speak to Brown's primary care physician about medical management of the gout. [Tr. 188].

On May 24, 2004, Dr. Luchini found that Brown had bursitis with decreased ROM and some obvious deformity, in both elbows.  She noted that Brown was suffering from degenerative joint disease in several joints, including the elbows, and she noted also that Brown's gout was well controlled on medication.  No particular treatment for the elbows was recommended at that time.

[Tr. 205].

On June 17, 2004, Brown reported in a Daily Activities Questionnaire that he was doing exercises to help with his elbow condition, but he still did not have full ROM in the left elbow; he said he could only bend that elbow to 90 degrees and couldn't straighten it up all the way. [Tr. 119]. He also reported that he had quit shaving, because "my arms and wrist don't work like they should." He said he combs his hair by using his right arm only, because the left arm won't bend enough. He also said that typing or using a keyboard is painful due to arthritis in his hands and elbows. [Tr. 121, 124].

The Court finds that the above-noted portions of the record dealing with Brown's bilateral elbow problems support the ALJ's RFC finding that Brown is capable of a full range of light work, but limited by postural restrictions of only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. The records indicate that Brown suffers from calcific tendinitis in the elbows, and that his symptoms can also be attributable to gout. As noted above, his gout is well controlled on medication and responds to abstinence from alcohol. Although he has some limited ROM in the elbows, he is still capable of rather strenuous activity with his arms, including building a porch onto his trailer, doing gardening, and working at hobbies such as wood carving.

As was true with the evidence regarding Brown's hand and wrist problems, there is nothing in the record outlined above to refute the assumption that Brown can lift up to 20 pounds at a time with frequent lifting of objects weighing up to 10 pounds, or that he can perform a job that requires sitting most of the time with some pushing of arm controls.

e.  *Misinterpretation of the ALJ's RFC statement*

In his Reply brief [Doc. 22, at 3-4], on the issue of the RFC finding, Brown relies to a large extent on an argument that the ALJ's "prohibition against 'prolonged periods of sitting, standing,

or walking'" directly contradicts the finding that Brown can perform the full range of light work. This assertion, that the ALJ placed a limitation on prolonged periods of sitting, standing or walking activities, appears to be a mis-reading of the ALJ's statement.

The ALJ found that Brown retains the RFC "to perform a full range of light work activities that requires":

(1) "lifting of no more than 20 pounds at a time";

(2) "frequent lifting or carrying of objects weighing up to 10 pounds";

(3) *"prolonged period of sitting, standing, and or walking"*;

(4) "some pushing and pulling"

(5) "and only occasional climbing, balancing, stooping, kneeling, crouching, and crawling." [Tr. 21, emphasis added].

Brown's interpretation of the ALJ's RFC finding with respect to Item (3) above would import the word "no" just prior to the word "prolonged." The word "no" does not appear, however, in the ALJ's finding. A fair reading of the finding compels the conclusion that the ALJ determined that Brown *is* capable of prolonged periods of sitting, standing, or walking. That determination is consistent with an RFC of light work which, as noted above, includes the requirement of standing or walking, off and on, for a total of approximately six hours in an eight-hour day, with sitting occurring intermittently during the remaining two hours.

As discussed in the next section, there are some references in the record to Brown's assertions that must take frequent breaks while working in the yard, and that he has to rest after walking some distance. However, there are also references to Brown's activities in walking his dog, hiking, doing maintenance work on his Jeep and house, attending classes, driving to the store and to appointments, and sitting for prolonged periods while watching TV. The Court finds that the

31

record evidence supports the conclusion that Brown is capable of sitting, standing and walking for prolonged periods.

Brown acknowledges that "[t]he Commissioner is correct that these limitations [*i.e.*, the limitations to only occasional climbing, balancing, stooping, kneeling, crouching, and crawling] are not so serious" but contends that the Commissioner neglected to mention what Brown took to be the more serious prohibition on prolonged sitting, standing and walking. Because Brown misinterpreted the ALJ's finding in this regard, the Court rejects this argument.

     f.  *Findings re: Credibility and Effect of Substance Use*

The ALJ noted that despite the evidence of physical limitations as summarized above, Brown is still capable of independent cooking and shopping, and that he can perform his household chores and take care of his personal needs. In addition, he enjoys hobbies of painting and woodcarving which require extensive use of his upper extremities, and he frequently expresses an interest in doing volunteer work. Brown does not dispute these assertions, and the record supports them. The ALJ found that extent of Brown's daily activities was consistent with the RFC assessment made.

Brown argues that the sporadic performance of household tasks or work does not establish that a person is capable of engaging in substantial gainful activity. However, the record establishes that Brown's capacity to do daily activities is much more than "sporadic."

In a Daily Activities Questionnaire dated November 6, 2003, Brown stated that he does his own shopping and can carry the groceries himself, although he has some difficulty steering the car, and getting in and out of it, due to arthritis. He does his own cooking and typically prepares meals two to three times a day, mostly prepackaged and microwaveable foods. He has some difficulty using cooking utensils due to arthritis. He does his own laundry and cleans his own house, and does some yard and home maintenance, although he has to take frequent breaks. His recreational

activities include woodworking, gardening and hiking, although he says his illness makes these things harder to do.  [Tr. 97-99].  He also said that he takes care of his own grooming and dressing needs, although he has some trouble combing his hair because of the arthritis in his hands.  He gets tired easily. [Tr. 104-105].

Brown told his mental health counselor, in several visits between December 2003 and July 2004, that he enjoyed wood carving, painting and gardening, and he repeatedly expressed interest in doing volunteer work and participating in community activities.  His counselor encouraged these activities as part of Brown's therapy.  [Tr, 268-297]

In a June 17, 2004 Daily Activities Questionnaire, submitted in connection with his Request for Reconsideration, Brown stated that he still cooks his own meals but has to sit down frequently as it hurts to stand in one place for any length of time.  He said that when he gets tired of watching TV, he will "piddle around in the yard" but has to take breaks every few minutes.  He goes shopping once or twice a month and gives his neighbor rides to the store. [Tr. 117].  He drives but has difficulty getting in and out of vehicles.  He still does his own household chores, but "not nearly as much as I should." [Tr. 118].  His hobbies include wood carving, painting and gardening. [Tr. 119].

In a "Function Report" dated June 27, 2004, Brown's brother stated that Brown walks his dog and does daily chores, prepares his own meals, takes care of his own house and yard, drives a car and does his own shopping for food and supplies, as needed.  Brown also does maintenance on his Jeep and truck, as well as the house, and does a good job at these things, although they take a longer time than they did before his condition worsened.  He also said that Brown takes himself to his doctor's appointments and to his volunteer job, watering the garden at a women's shelter. [Tr. 127-131].  He noted that Brown was limited in a number of physical abilities and has to take breaks after short periods of sitting, standing, and walking, due to pain. [Tr. 132].

33

In a Disability Report which Brown filled out on September 14, 2004, Brown stated that, since the last report, he was less able to do his daily activities and spent less time on his feet and more on the couch. [Tr. 140].

At the administrative hearing on December 16, 2005, Brown testified that he was enrolled in a program that could lead to an Associate Degree in graphic arts, and that he was also taking classes at the university in fiction writing.  Brown stated that going to school is part of his therapy. [Tr. 601-603].  In addition, Brown stated that when he first applied for General Assistance and food stamps, he was referred to the New Mexico Department of Vocational Rehabilitation.  He was told at DVR that he was basically unemployable, and it was recommended that he go back to school. [Tr. 606-607].  Brown acknowledged that the graphic arts program in which he was enrolled would not necessarily lead to employment but was more "to keep busy and stay occupied."  [Tr. 603].

The record evidence indicates that Brown is able to take care of his own food preparation, shopping, household, yard and maintenance chores, as well as his own grooming and dressing needs. He can drive himself and others on shopping trips and to appointments.  He has done volunteer work and enjoys hobbies which require physical exertion and manipulative skills.  He has some difficulty with these activities due to pain and limited ROM; however, he can accomplish all of these tasks on a daily basis.  In addition, Brown is able to attend classes at the university level.

The Court finds that the ALJ did not err in his assessment that Brown's daily living activities, and his hobbies, volunteer and school activities, were indicative of an ability to engage in substantial gainful activity.  While it is true that the school and volunteer activities were suggested or encouraged by Brown's mental health therapist, the pertinent issue is not the motivation for engaging in these activities, but what they demonstrate about Brown's ability to perform work.

The above-described record evidence further supports the ALJ's finding that Brown's

34

medically determinable impairments could reasonably be expected to produce the symptoms alleged, but that Brown's statements concerning the intensity, persistence and limiting effects of these symptoms is not entirely credible.

The ALJ also found that Brown's condition is much improved when he abstains from alcohol and drugs, and this finding is supported by record evidence.  The record indicates that Brown's painful joints are caused by a number of factors, including osteoarthritis, calcific tendinitis, torn meniscus, and gout.  The record reflects that Brown's physicians attribute his gout symptoms, or exacerbation of those symptoms, to his use and abuse of alcohol.  [*See, e.g.*, Tr. 211, 216-217, 219].

Brown's primary care physician stated in her medical notes in December 2003 that she thought Brown was capable of working, but that his ongoing alcohol issues "are very much a factor in him being able to maintain employment." [Tr. 217].  She stated further that if Brown gets appropriate psychiatric care and gets his alcoholism under control, he may be better able to get some training and employment. [Id.].  However, the doctor noted later, in May 2004, that even though Brown was maintaining sobriety at that time and was feeling better and becoming more sober, he reported he was still having a difficult time trying to find any sort of work "because he just can't do it, between his shoulders, elbows, knees and hips." [Tr. 205].

An Intake Assessment by Tim Johnson, LADAC, LPCC at the Border Area Mental Health Services, dated December 10, 2003, noted that Brown used alcohol to excess and that he said he was not interested in quitting.  This counselor stated that Brown was a chronic alcoholic and had been for 30 years, and that he was in denial concerning the negative impact alcohol had on his life.  Johnson also noted that it would be very difficult to accurately assess Brown for a diagnosis of depression, due to the quantities of alcohol he had been consuming.  [Tr. 300-301, 309].  Johnson concluded that Brown:

> has been drinking alcohol and using other drugs for the past thirty years and has developed a pattern of living and thinking that has not been conducive to a successful life.  He is an habitual user of alcohol and recognizes this drug[']s effect on his life although has little volition to begin to resolve this problem.  He has basically given up and finds it easier to accept the state[']s assistance in the form of food stamps and cash assistance.

[Tr. 309].

While the determination as to effect of substance use is ultimately up to the ALJ and the opinions of claimant's treating health care providers in this regard is not dispositive, their opinions are nevertheless relevant and were appropriately taken into account by the ALJ.

Brown's treatment at Border Area Mental Health was intended to help him with his alcoholism and depression.  The records indicate that, during the period of treatment, December 2003 to July 2004, Brown was successful, at least for a time, in maintaining sobriety.  [Tr. 268-297]. His depression was greatly improved when he was taking Lexapro [Id., Tr. 209, 210, 212, 564], although Brown's marijuana use tended to counteract the effect of the Lexapro.  [Tr. 273].

The above evidence supports the finding that Brown's substance use is a contributing factor material to the determination of disability, and that if he were to stop the substance use, he would be capable of performing the range of light work noted by the ALJ.

In sum, the Court finds that the ALJ's RFC finding is supported by the record.

### **Recommended Disposition**

That Plaintiff's Motion to Reverse or Remand Agency Decision [Doc.  18] be denied.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
Chief United States Magistrate Judge

36